Filed 1/23/24  Save Jacumba v. San Diego County Bd. of Supervisors CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAVE JACUMBA et al., | D081148 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2021-00040109-CU-TT-CTL) |
| SAN DIEGO COUNTY BOARD OF SUPERVISORS, | |
| Defendant and Respondent; | |
| JVR ENERGY PARK, LLC, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

Law Offices of Stephan C. Volker, Stephan C. Volker, Stephanie L. Clarke and Jamey M.B. Volker for Plaintiffs and Appellants.

Claudia G. Silva, County Counsel, and Joshua M. Heinlein for Defendant and Respondent.

Brownstein Hyatt Farber Schreck, Ryan R. Waterman, Christopher R. Guillen, Matthew L. Hofer and Mackenzie W. Carlson for Real Party in Interest and Respondent.

INTRODUCTION

This appeal involves the County of San Diego's approval of a solar project (Project) next to the community of Jacumba and the certification of an Environmental Impact Report (EIR) for the Project under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] Save Jacumba, We Are Human Kind, LLC, and Jeffrey Osborne (together, Appellants) filed a petition for writ of mandate against the San Diego County Board Of Supervisors (County or Board) and the developer, JVR Energy Park, LLC (JVR) (together, Respondents). The superior court entered a judgment denying the petition.

On appeal, Appellants argue the County's land use determinations were inconsistent with, or in violation of, its planning documents; the EIR did not provide a stable project description or adequately consider a reduced project alternative; and the EIR did not adequately analyze and/or mitigate various environmental impacts. We conclude their contentions lack merit, and we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Jacumba, Parties, and Project Site*

Jacumba is an unincorporated community near the Mexico border. It was a tourist attraction in the early 20th century, including due to its natural

_____

[1]    Further section references are to the Public Resources Code unless noted. Rule references are to the California Rules of Court.

hot springs and hotel, and its population exceeded 5,000 by the 1930's. It later faced competition from Palm Springs and Murietta, and went into economic decline after I-8 bypassed the community. By 2010, the population was around 560.

Save Jacumba is a citizens' association. We Are Human Kind, LLC (Human Kind) owns the Jacumba Hot Springs Resort. Osborne is a resident of Jacumba, and a partner and manager of Human Kind. A company called Dudek prepared the EIR for developer JVR, and BayWa r.e. Solar Projects LLC (BayWa) supplied additional technical memoranda.[2]

The approved Project would cover 604 acres on a 1,356 acre site. Jacumba is located southwest of the Project site, and Jacumba Community Park borders it. Old Highway 80 crosses Jacumba, and bisects the site. The Sunrise Powerlink, Southwest Powerlink 500 kV, and San Diego Gas & Electric (SDG&E) 138kV transmission lines also cross the site. As for the rest of the site's surrounding area, I-8 is to the north. The Jacumba Solar Facility and East County Substation are located around two miles east, and Jacumba Airport is to the southeast. The international border fence is to the south. Anza-Borrego Desert State Park sits to the west.

B.    *JVR Application, EIR, and County Approval*

In November 2017, JVR applied for a solar project on the site, which included the "photovoltaic units" ("PV" modules or solar panels), a "battery energy storage system, a substation, a switchyard, overhead transmission lines, and supporting electrical components." The "Switchyard Facilities" would cover 8.1 acres, and consist of the switchyard, which "controls the

---

[2]    Respondents note JVR is wholly owned by BayWa r.e. Development, LLC, but do not otherwise explain the entity relationships. We refer to BayWa separately only in the context of the technical memoranda.

output of energy to the grid," and an "overhead connection to the existing SDG&E transmission infrastructure." The planned operational life of the Project was 35 years, after which all components besides the Switchyard Facilities would be decommissioned.

In March 2019, the County issued a Notice of Preparation, which initially indicated the Project "would require a General Plan Amendment, a Rezone, and a Major Use Permit."

A Draft Environmental Impact Report (DEIR) was circulated from October to December 2020. The DEIR stated the General Plan Amendment and Rezone applications had been withdrawn, and (as we elaborate below) a Major Use Permit (MUP) could be granted subject to a bonded agreement sufficient to ensure component removal. Project alternatives included a Community Buffer Alternative and Reduced Project Alternative, which had smaller footprints, and mitigation measures included an on-site, 435-acre biological open space easement (biological easement). The County received over 150 comments.

The Final EIR (FEIR or EIR unless specified), dated June 2021, reflects the Project was revised to increase setbacks from Jacumba Community Park and Old Highway 80, and would now use bifacial solar panels, with higher wattage, to maintain the same energy capacity.

The Planning Commission hearing was in July 2021. County staff recommended the Community Buffer Alternative. Two Planning Commissioners commented that residential development was unlikely, because of "vehicle miles traveled . . . ." By a five to two vote, the Planning Commission recommended the Board approve the Project, including adoption of the Community Buffer Alternative.

4

The Board hearing was in August 2021, and many members of the public spoke and raised concerns. The Board unanimously approved the Project. It approved a MUP, certified the EIR, adopted the Community Buffer Alternative, and expanded the setback, while directing JVR to "provide $4,000,000 toward community benefits" in Jacumba. It also adopted a Statement of Overriding Considerations for impacts to certain visual and mineral resources, and found they were outweighed by the Project's "considerable benefits."

C.    *Appellants' Petition for Writ of Mandate*

In September 2021, Appellants filed a petition for writ of mandate against the Board and JVR. They cited multiple jurisdictional grounds, including Code of Civil Procedure sections 1085 (traditional mandamus) and 1094.5 (administrative mandamus). Their first cause of action alleged the EIR certification and Project approvals were contrary to CEQA. Their second cause of action alleged the Project approvals were contrary to the General Plan and Zoning Ordinance, citing Code of Civil Procedure section 1094.5.

In May 2022, Respondents both moved for judgment on Appellants' petition. Appellants responded with a motion for peremptory writ of mandate. Respondents filed a joint reply brief. The trial court heard the matter in June 2022. In August 2022, it granted Respondents' motions and entered a judgment denying Appellants' petition with prejudice. Appellants timely appealed.

DISCUSSION

I.    *Respondents' Arguments for Forfeiture*

Respondents argue Appellants forfeit issues based on appellate briefing standards (which we find persuasive), and for not exhausting administrative remedies or properly pleading their land use claim (which we do not).

5

A.     *Appellate Briefing Standards*

Briefs must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Rule 8.204(a)(1)(B); see *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 339, fn. 10 (*SOMA*) [a "record citation, standing alone, does not suffice to raise a legal or factual issue"].) "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*).)

An appellant also must "fairly set forth all the significant facts, not just those beneficial to the appellant." (*In re S.C.* (2006) 138 Cal.App.4th 396, 402; rule 8.204(a)(2)(C) [brief must "[p]rovide a summary of the significant facts"].) We "may decide that the appellant has forfeited a point . . . when it is not supported by accurate citations to the record." (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894.) Further, an appellant who challenges the sufficiency of the evidence "must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 (*Defend the Bay*).)

Points raised for the first time on reply also may be deemed forfeited. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 (*Raceway*) ["We generally do not consider arguments raised for the first time in a reply brief"]; *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693 (*Groundwater Cases*) ["Basic notions of fairness dictate that we decline to entertain arguments that a party has chosen to withhold until the filing of its reply brief, because this deprives the respondent of the opportunity to address them on appeal."].)

6

Here, Appellants' opening brief contains one-sided descriptions of the record; many points lack reasoned argument, authority, or explanation of the evidence; and they raise new arguments on reply. Respondents filed an opposed motion to strike or disregard certain of those newly raised reply arguments. We grant Respondents' motion to strike in part, insofar as we agree Appellants improperly raised new points and will disregard them in our discussion as warranted. We will also apply other forfeiture principles as applicable.

B.      *Exhaustion of Administrative Remedies*

Next, Respondents argue Appellants did not exhaust administrative remedies on several issues. They do not address the trial court's rejection of their exhaustion arguments below, or why no cross-appeal was needed to preserve the issue in whole or part here. (Cf. *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 587.) Assuming it were properly before us, we would conclude there is no lack of exhaustion.

Administrative exhaustion is required under CEQA and to challenge land use decisions. (§ 21177, subds. (a), (b); Gov. Code, § 65009, subd. (b)(1).) An " 'issue must first have been raised during the administrative process to be preserved for judicial review," but "may be argued in court by a different person.' " (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104 (*Save the Hill*) [addressing CEQA]; § 65009, subd. (b)(1) ["issues raised shall be limited to those raised in the public hearing"].) The " ' "objections must be sufficiently specific" ' " so the agency can " 'respond to articulated factual issues and legal theories before its actions are subjected to judicial review.' " (*Save the Hill*, at pp. 1104-1105; *id.* at p. 1105 [although exact issue must be raised, and general references are not enough, objections need only " ' "fairly apprise[ ]" ' the agency of the EIR's purported defect"].)

7

The burden is on the petitioner, and we apply de novo review. (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 677 (*Save Agoura*).)

The pertinent issues identified by Respondents are: (i) the Switchyard Facilities "do not 'provide essential services' because [they] will provide no electricity locally, and are not 'necessary to provide essential services' because the ECO Substation is three miles away"; (ii) the EIR has an "unstable Project description because it fails to identify the particular number of solar panels"; (iii) the County "improperly rejected the Reduced Project Alternative"; (iv) the biological easement "cannot be used to mitigate impacts to tricolored blackbird habitat and vegetation"; and (v) the County "improperly assigned the site a low 'land use consistency' rating in analyzing agricultural impacts due to parcel sizes in Jacumba."[3]

The parties' own briefs and record citations establish the matters at issue were raised below, through objections and concerns from commenters including Appellants and wildlife agencies. (See *Save the Hill, supra*, 76 Cal.App.5th at p. 1104.) Although some issues were not raised with the precise language used by Appellants in court (e.g., solar panel number; adequacy of the biological easement), the objections fairly apprised the County of the concerns at issue. (See *Save Agoura, supra*, 46 Cal.App.5th at p. 677; *Save the Hill, supra*, at pp. 1104-1105.)

---

[3] Respondents argue Appellants failed to exhaust other issues too. As we will explain, Appellants forfeit most by not supplying adequate argument (flooding and electrocution; emissions; and groundwater), and state on reply they presented them for "context[ ]." The remaining issue (inconsistency of the Zoning Ordinance with the General Plan) was deemed untimely by the trial court and Appellants again indicate on reply they are not raising the issue.

C.    *Sufficiency of Pleading*

Finally, Respondents contend Appellants' Second Cause of Action as to land use consistency should be dismissed because they pled that claim under Code of Civil Procedure section 1094.5 (administrative mandamus), rather than Code of Civil Procedure section 1085 (ordinary mandamus). The trial court rejected this argument, stating "the allegations pertaining to the applicable standard of review are simply legal argument" and Appellants did "allege the court has jurisdiction of this matter pursuant to section 1085." Respondents do not explain why this ruling was erroneous. (Cf. *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 707 ["standard of review . . . is not materially different"; citing cases applying administrative and ordinary mandamus to consistency findings].)

Further, the case cited by Respondents here, *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444 (*Stop Syar*), did not even involve a separate cause of action for the consistency issue, and the reviewing court still elected to address it. (*Id.* at pp. 450, 460-463 [petitioner that filed writ petition challenging EIR certification under Public Resources Code section 21168 could not challenge consistency of EIR with General Plan, because it did not amend petition to "add a cause of action for ordinary mandamus"; still reaching and rejecting argument].)

II.    *Land Use Determinations*

Appellants contend the County's Project approvals violate the Planning and Zoning Law (Gov. Code, § 65000 et seq.) because they are inconsistent with the General Plan, Mountain Empire Subregional Plan, and Jacumba's Vision Statement. They also contend the Project violates the Zoning Ordinance. We reject these contentions.

9

A.    *Applicable Law and Standard of Review*

"To ensure that localities pursue 'an effective planning process' [citation], each city and county must 'adopt a comprehensive, long-term general plan' . . . ." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152 (*Orange Citizens*), citing Gov. Code, § 65300.)

"Any local land use or development decision . . . must be consistent with the applicable general plan . . . ." (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 201 (*Clews*).)  General plans " 'ordinarily do not state specific mandates or prohibitions,' " but rather " 'state "policies," and set forth "goals." ' " (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 411-412 (*Holden*).)  "Perfect conformity is not required, but a project must be compatible with the objectives and policies of the general plan.  [Citation.]  A project is inconsistent if it conflicts with a general plan policy that is fundamental, mandatory, and clear." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.) "By contrast, a local agency has ' "some discretion" ' when it comes to a relatively 'amorphous' policy." (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 697 (*Joshua Tree*).)

We review a public agency's "determination whether a project is consistent with its general plan for abuse of discretion."  (*Olen Properties Corp. v. City of Newport Beach* (2023) 93 Cal.App.5th 270, 277, citing *Orange Citizens, supra*, 2 Cal.5th at p. 154.)  This determination is "fundamentally adjudicatory," and "entitled to deference as an extension of a planning agency's ' "unique competence to interpret [its] policies when applying them in its adjudicatory capacity." ' " (*Orange Citizens*, at p. 155.)  The party challenging the determination "has the burden to show why that determination is unreasonable."  (*Holden, supra*, 43 Cal.App.5th at p. 413.)

10

Similar principles apply for zoning determinations.  (See *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193 (*Anderson*) [agency's " 'view of the meaning and scope of its own [zoning] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized.' "]; cf. *Smith v. County of Los Angeles* (1989) 211 Cal.App.3d 188, 197-198 [conditional use permit "is, by definition, discretionary"].)

"Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens, supra*, 2 Cal.5th at p. 155; *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719-720 (*Sequoyah*) ["It is, emphatically, *not* the role of the courts to micromanage these development decisions"; reviewing court's function is to decide if officials considered "extent to which the proposed project conforms" with applicable policies and made "appropriate findings" supported by the evidence]; see *id.* at p. 720 [declining to reweigh conflicting evidence].)

B.    *General Plan, Subregional Plan, and Vision Statement*

Appellants argue the Project was inconsistent with various portions of the General Plan and its Mountain Empire Subregional Plan, as well as Jacumba's Vision Statement.  These arguments are not persuasive.

1.    *Additional Facts*

a.    *Planning Documents*

In 1986, the Board amended the General Plan to designate around 1,300 acres next to Jacumba as a Specific Plan Area (SPA), and most of the Project site is within it.  A "Specific Plan envisions a multi-use land use concept that may contain residential, commercial, industrial, public

11

institutional, and open space uses."[4]  In 1991, a developer submitted a proposed Jacumba Valley Ranch Specific Plan with over 1,000 residences, a school site, commercial and recreational uses, and open space.  The plan was denied in 2002.  In 2006, another applicant proposed the Ketchum Ranch Specific Plan, also with over 1,000 residences, as well as commercial and recreational uses.  This plan was withdrawn in 2011.

The Mountain Empire Subregional Plan (Subregional Plan) is a supplement to the General Plan, which establishes "goals and policies to guide development" in the subregion.  It is divided into chapters, and sets forth goals, findings, and policies and recommendations.  We discuss the specific portions cited by Appellants, *post*.

The Project site is within the Jacumba Subregional Group Area of the subregion.  According to the Subregional Plan, Jacumba "adopted a vision statement," and has "the option in the future to develop specific goals and policies."  A "Jacumba portion" of the Subregional Plan sets forth the Vision Statement, and has a "Background Information" section.  The background section summarizes Jacumba's history, and states in part that County planning documents have "long incorporated plans" for its "revitalization and growth . . . ."

> b.    *Consistency Findings*

The EIR found the Project was consistent with the General Plan, Subregional Plan, and Vision Statement.  The Planning Commission Hearing Report found the Community Buffer Alternative would be consistent with the land use plans and "compatible with the surrounding community."

---

[4]    Both parties rely on the Planning Commission Hearing Report for this description; because they concur, and it is unclear if the relevant General Plan portion is in the record, we utilize it as well.

12

The County adopted the Community Buffer Alternative, and, in the MUP, found the Project was "consistent with policies of the [General Plan] and the [Subregional Plan], as well as the vision statement" for Jacumba. It stated that although Jacumba was "predominantly rural," the area was "becoming increasingly developed with private facilities, civic uses, and energy infrastructure," and elsewhere noted "[r]enewable energy projects have resulted in a change to the physical setting . . . and surrounding neighborhood character." It further stated the Project was "designed to minimize impacts on the natural and developed environment," including cultural resources, sensitive habitats, and impacts to grading, and features like "landscape screening" would "lessen the visual contrast . . . ." The County concluded the Project "will not have a harmful effect upon desirable neighborhood character," and noted the Project would be decommissioned at its conclusion.

2.    *Analysis*

a.    *Whether Policies Are Fundamental, Mandatory, and Clear*

Before we turn to specific parts of the planning documents, we address Appellants' contention that they rely on fundamental, mandatory, and clear policies. Respondents disagree, and argue the polices are amorphous. We agree with Respondents.[5]

Amorphous policies encourage or support development or preservation, without requiring particular approaches or outcomes, thus leaving their application to agency discretion. (See, e.g., *Sequoyah, supra*, 23 Cal.App.4th at pp. 709, 719-720 [general plan policies that "encourag[ed] development . . .

_____

[5]    Appellants also characterize Zoning Ordinance section 2888 as a fundamental policy violated by the Project approvals. We address the Project's consistency with the Zoning Ordinance below.

sensitive to natural land forms, and the natural and built environment" were not mandatory]; *Save the Hill, supra*, 76 Cal.App.5th at p. 1116 [general plan provision requiring city to " 'preserve . . . the [area] as [an] important wildlife and plant habitat[ ] through preservation of open space" was "merely aspirational"]; *Joshua Tree, supra*, 1 Cal.App.5th at pp. 696-697 [community plan had "policy of encouraging and supporting small independent businesses"; " 'Encourage' and 'support' are precisely the sort of amorphous policy terms that give a local agency some discretion"]; *Old East Davis Neighborhood Assn. v. City of Davis* (2021) 73 Cal.App.5th 895, 908-909 [mixed-use building project; planning document policies requiring " 'sensitiv[ity] to the area's traditional scale and character' " and " 'scale transition' " were "largely amorphous"].)

These are the kind of policies identified by Appellants. They contend, in substance, that the Project conflicts with Jacumba's desired revitalization as a rural community, which includes preserving the natural environment, and cite policy language that aligns with these aims. That does not make the policies fundamental, mandatory, and clear.

The cases cited by Appellants are distinguishable, including because they involve more concrete policies, such as a contiguous development restriction, or agency staff disagreement as to consistency. (See, e.g., *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1339-1340 [subdivision project using " 'low density residential' " designation was inconsistent with general plan policy that designation was " 'restricted to . . . lands contiguous" to certain specified areas]; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 607-608, 640-642 (*Plant Society*) [general plan policy required mitigation to special-species impacts be " 'designed . . . "in

14

coordination with" ' " identified wildlife agencies; city failed to comply with "mere solicitation and rejection of input"]; *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 753 [no substantial evidence for finding that cemetery was consistent with general plan; policy required protection of " 'beneficial, rare or endangered animals and plants with limited or specialized habitats' " and county staff recommended denial due to inconsistency].)

We now turn to the policies and provisions cited by Appellants; elaborate on why they are amorphous, as applicable; and explain why Appellants do not show the County erred in finding consistency, regardless.

        b.     *Specific Plan Area Designation and Vision Plan*

Appellants contend the Project violates the site's SPA designation, because its "monolithic industrial use prevents Jacumba from fulfilling its Vision Statement to be a multi-use rural village promoting its natural scenic and hot springs resources."

First, as noted, the SPA description states a "Specific Plan envisions a multi-use land use concept that may contain residential, commercial, industrial, public institutional, and open space uses." This description contains discretionary language ("may contain"), and does not require any particular use or combination of uses—nor refer to the Vision Statement. At any rate, the County found the Project was consistent with the General Plan, and could impliedly conclude that consistency extended to the SPA designation. In addition to providing a desirable industrial use (i.e., sustainable energy), the Project would retain open space through the biological easement and supply commercial activity with its construction, operation, and decommissioning.

15

Second, Jacumba's Vision Statement states the "community supports new development" that is "compatible with, and preserves the natural and historical environment" and "manages growth to reinforce the rural small town character of the area, which includes agriculture, open space, and trails as important elements of the community." This language is aspirational and vague (e.g., "supports new development"; "rural small town character"), reflecting its amorphous nature. (See *Save the Hill, supra*, 76 Cal.App.5th at p. 1116; *Joshua Tree, supra*, 1 Cal.App.5th at pp. 696-697.) Although some language in the Vision Statement has more specificity (e.g., "We want schools for the young"), it likewise addresses desired aims, not mandates. Moreover, the Subregional Plan states Jacumba has the "option . . . to develop specific goals and policies," implying the Vision Statement does *not* serve that role.

The County still found the Project was consistent with the Vision Statement, and could reasonably do so. With respect to having development be consistent with natural and historical resources, the FEIR analyzed and mitigated impacts to these resources (see CEQA discussion, *post*). As for the community's rural character, the County determined in its MUP findings that Jacumba had remained rural, notwithstanding increased energy infrastructure, and could fairly find the Project would not impede community character, either.

Appellants suggest the Project would still be inconsistent with the Vision Statement because it "blocks Jacumba's only geographically possible area of growth on its east side." They elsewhere assert it precludes Jacumba's "planned restoration as a tourist destination." These points lack merit. As noted, two Planning Commissioners observed residential growth was unlikely, given commuting distances. Even if growth were feasible,

16

Appellants do not show the current community footprint is insufficient (and the Project site would be available as well, after decommissioning).

As for restoring tourism, the Vision Statement does not expressly discuss it. The conservation chapter of the Subregional Plan does have a policy that the "Jacumba Hotel should be restored, if at all possible," but this conditional "if at all possible" language reflects it is not fundamental, mandatory, and specific. (See *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511 [winery project was not inconsistent with specific plan policy that wetlands " 'be protected in their natural state, unless this is proved to be infeasible' "; plan "used the term 'feasible' to allow the County's agencies a measure of flexibility in their decisionmaking"].) More generally, Appellants do not establish the Project would even have any impact on tourism (particularly given the existence of other energy infrastructure nearby, and issues like I-8 bypassing the community).

c. *Land Use Provisions*

Appellants also argue the Project "[v]iolates the Subregional Plan's Land Use Controls," based on various portions of the land use chapter.

Appellants cite a general land use policy, which states in part that "[h]illside grading shall be minimized," and an industrial goal to "provide a land use pattern which will permit those kinds of industrial uses that will not detract from the rural charm and lifestyle of the subregion." They also cite the residential land use goal, findings, and policies. The residential goal is to "accommodate the forecast population increase, while retaining the rural charm of the present living environment." The findings note the subregion is "generally undeveloped," and the "ability to experience large open spaces and views to distant hills is essential" to quality of life. The policies include: "Apply a Rural Village Boundary" to the "historically significant

17

settlement[ ]" of Jacumba; "Maintain the existing rural life style by continuing the existing pattern of . . . large lots outside of the Rural Villages"; "Preserve open space areas"; and "Avoid all extensive . . . grading."

Appellants quote these policies without explanation in their opening brief, other than to suggest the County's determination that the Project was temporary (i.e., for zoning purposes) was contrary to them. This was insufficient to establish the Subregional Plan consistency finding was erroneous. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.)

Even if we reached their belated points on reply, we would not be persuaded. They argue these policies are fundamental because they "provide comprehensive, unified and long-term direction" on "permissible use of the lands," and mandatory because they are "expressed as affirmative commands." They also argue the policies "form an interlocking and cohesive set of land use prescriptions that as a whole forbid preemption of Jacumba's ability to achieve its Vision . . . ."

Given that all land use documents provide direction on land use, that cannot be enough to render policies fundamental. As for supposed commands and prescriptions, the policies do not mention the Vision Statement, but do encompass the same amorphous aims (e.g., "rural charm")—so, regardless of any imperative language, they are not substantively mandatory or specific. Further, even if some of this policy language did require consistency, the County found the Project was consistent with the Subregional Plan and Appellants do not establish that finding was unreasonable. (See *Orange Citizens, supra*, 2 Cal.5th at p. 155.)

d.    *Old Highway 80*

Next, Appellants argue the Project violates the Subregional Plan's "designation of Old Highway 80 as a Scenic Highway by destroying and

18

degrading the historic and scenic resources . . . for nearly one mile." The goal of the scenic highways chapter is to "establish a network of scenic highway corridors within which scenic, historical and recreational resources are protected and enhanced." The findings state there "are five scenic corridors," including "Old Highway 80 through Boulevard and Jacumba." No specific policies are listed.

First, Appellants contend the scenic highway designation is fundamental, mandatory, and specific, because the protected resources are "fundamental to . . . quality of life"; it states the resources "are protected" (not "may" be); and it identifies specific road sections. We disagree. This plan language describes both the resources ("scenic, historical and recreational") and treatment ("protected and enhanced") in general terms, and imposes no particular limits on the use of these highways or their surroundings.

Second, Appellants also do not establish any inconsistency. The County's MUP finding that the Project was consistent with the Subregional Plan could impliedly encompass the Old Highway 80 designation. Indeed, the County acknowledged Old Highway 80 was designated a scenic highway, noted there would be a setback and landscape screen, and said the Project would "not alter [its] physical character . . . ." It also noted, and the record reflects, that views were already impacted by other infrastructure (e.g., transmission lines crossing the site).

Appellants argue the FEIR admits the Project "would substantially reduce the quality of existing views" from Old Highway 80, and the "sole excuse" is that "there are no current local regulations" for development next to it. The FEIR said that although visual impacts from Old Highway 80 were "significant and unavoidable," mitigation measures like "landscaping and . . . screened fencing" would "substantially reduce" the visibility of Project

components.  As for the regulations, the FEIR explained the lack of current regulation had led to energy infrastructure *already* existing in the viewshed—and noted the Project would not prevent the County from "establishing regulations" to "protect[ ] and enhance[ ]" scenic highways. None of this undermines the County's consistency finding.

e. *Conservation and Use Policy 18.3*

Finally, Appellants contend the Project violates Policy 18.3 of the General Plan's Conservation and Open Space (COS) Element.

Policy 18.3 is under Goal COS-18, which is titled "Sustainable Energy" and calls for "Energy systems that reduce consumption of non-renewable resources . . . while minimizing impacts to natural resources and communities."  Policy 18.3 itself states:  "Require alternative energy system operators to properly design and maintain these systems to minimize adverse impacts to the environment."  The FEIR found the Project was consistent with Policy 18.3, and stated "[a]ll impacts to the environment," besides visual and mineral impacts would be "less than significant" with mitigation.  The County noted the FEIR's consistency analysis in the MUP, and found in the Statement of Overriding Considerations that both types of impacts were outweighed by the Project's benefits.

Appellants' arguments lack force.  They first summarily assert Policy 18.3 is fundamental, mandatory, and specific.  Setting aside that the policy contains general, nonspecific language (e.g., "impacts to the environment"), there is no real dispute the Project had to minimize environment impacts under CEQA, if not the General Plan.  Appellants simply disagree with the County that it did so.

They then list a series of alleged impacts, which overlap with their CEQA arguments.  They contend the Project eliminates more habitat than

20

needed to meet energy goals, seemingly referencing their CEQA argument about the rejection of a smaller project alternative. They also identify other purported failures, including that the Project: "shortcut[s]" research requested by wildlife agencies; fails to mitigate impacts on specialized habitats; "omit[s] . . . cultural consultation" requested by tribes; fails to mitigate farmland losses; uses "fire-prone and toxic lithium ion batteries"; and places structures near an airport used by gliders with unstable flight paths. We address these contentions in addressing Appellants' CEQA arguments, and, as we will explain, they lack merit. Accordingly, Appellants establish no inconsistency with Policy 18.3, either.

C. *Zoning Ordinance*

Appellants make several arguments regarding the Zoning Ordinance, which turn on their view that the Project was both functionally permanent and oversized. They are not persuasive.

1. *Additional Background and Facts*

a. *Zoning Ordinance*

The Zoning Ordinance includes the "S88 Specific Planning Area Use Regulations" (S88 Use Regulations) which "are intended to accommodate Specific Plan areas" and "lands for which a Specific Plan" was adopted. Section 2888(a)[6] provides:

> "Prior to adoption of a Specific Plan, a Major Use Permit may be granted pursuant to the S88 Use Regulations to authorize, for a specified period of time, any use not involving a significant investment in buildings, structures, or other improvements. Alternatively, a Major Use Permit may be granted for any use pursuant to a bonded agreement in an amount sufficient to ensure the removal of

---

[6] Section references in this discussion are to the Zoning Ordinance, unless otherwise specified.

21

all buildings, structures, and other improvements within a specified time and/or under specified conditions when the decision-making body finds that such agreement will carry out the intent of this Ordinance and is enforceable by the County."

Subdivision (b) allows "any use set forth in the Specific Plan" following its adoption, and subdivision (c) states such uses "shall be subject to all of the conditions and restrictions . . . in the Specific Plan," and such conditions "prevail over [t]he Zoning Ordinance regulations" if in conflict.

Section 2884 states that "[u]ntil a Specific Plan . . . is adopted," certain "use types are allowed . . . upon issuance of a Minor Use Permit," including "Minor Impact Utilities." Section 1355 states: "The Minor Impact Utilities use type refers to public utilities which have a local impact on surrounding properties and are necessary to provide essential services. Typical uses are electrical and gas distribution substations." Under section 7352, subdivision (b), "[a]ny use allowed by a Minor Use Permit may be allowed by a Major Use Permit."

b. *Zoning-Related Findings*

The FEIR explained that since the Project would be decommissioned, except for the Switchyard Facilities, it was "considered to be an interim use," and a Major Use Permit could be issued under section 2888 subject to a bonded agreement to ensure removal. It further explained the Switchyard Facilities were "considered a Minor Impact Utility" under section 2884, and, after construction, would be "transferred to SDG&E and . . . only subject to California Public Utilities Commission jurisdiction." It stated the Major Use Permit would govern both uses. An FEIR subsection addressing decommissioning also stated, in part: "The use of the land would have to return to a use that is consistent with the [Zoning Ordinance] at the time of

22

dismantling. If a new use is not proposed, the decommissioning would include removal of all ground-level components and preparing the site with a compatible hydroseed mix." The FEIR then set forth dismantling, recycling, and other obligations.

The Planning Commission Hearing Report summarized these zoning matters, and noted the Project site "could be used for other land uses in the future." It also stated that "[p]rior to the expiration of the MUP . . . , the applicant will be required to apply for and receive approval of a MUP Modification to authorize further use of the site as a solar facility or return to a use consistent with the Zoning Ordinance" and indicated that, if a "new use is not proposed," similar requirements as in the FEIR would be imposed.

The County's MUP decision stated: "This permit is an interim use and is subject to a decommissioning or a Major Use Permit Modification approval by August 18, 2058 . . . ." It also stated that after transfer of the Switchyard Facilities, "the County acknowledges that it will lack land use permitting jurisdiction over the switchyard's operation and maintenance as carried out by SDG&E." The County then set forth conditions. One provided that "[p]rior to issuance of any building permits," a "decommissioning plan shall be provided . . . that ensures removal of the solar energy system" and includes a "secured agreement . . . ." Subsequent findings reiterated the bond requirement, and noted removal does not apply to the switchyard.

2. *Analysis*

Appellants do not establish the County's interpretation of the Zoning Ordinance was unreasonable or otherwise erroneous. (*Anderson, supra*, 130 Cal.App.4th at p. 1193.)

The County could reasonably determine it could issue a MUP for the Project under section 2888(a), without a General Plan Amendment or

rezoning. The developer, JVR, had to provide a bond before receiving a building permit, which would require it to remove all components besides the Switchyard Facilities after 35 years. These and related obligations are set forth in the MUP, as well as the FEIR and Planning Commission Hearing Report. The County could further impliedly determine the Switchyard Facilities were a local, necessary Minor Impact Utility under section 1355, and thus allowed under section 2884 without removal conditions (while still governed by the Major Use Permit under section 7352(b)). The Switchyard Facilities were limited in size (8.1 acres); the County could find they supplied a necessary contribution to the regional energy infrastructure; and it could find they were analogous to a substation (a listed example in Section 1355).

Appellants' arguments do not compel a different result.

First, Appellants suggest the Project is functionally permanent, in conflict with section 2888(a). They advance multiple theories here.

Appellants argue the Project "can be reapproved indefinitely," asserting developer JVR "is directed to resubmit a proposal for continued operation" when the MUP expires and "decommissioning is required only 'if a new use is not proposed' " (italics omitted). But JVR has no unilateral right to continue the Project, or to avoid decommissioning. Rather, it must "apply for and receive approval of a MUP modification" *if* it seeks to continue the solar facility. Otherwise, decommissioning is required. Appellants' concerns regarding indefinite reapprovals are thus speculative. (Cf. *Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 345-346, 349 ["possibility of an extension" for 50-year groundwater project was "far too speculative to require environmental analysis at this point"].)

Appellants then contend the "permanence" of the Switchyard Facilities would "trigger land use changes" that would persist after decommissioning—

24

but describe purported *Project* impacts on agriculture, wildlife and other resources. As our CEQA discussion will show, they also simply assume certain outcomes (e.g., that farming could not resume after decommissioning), despite FEIR findings to the contrary.[7]

Appellants relatedly contend the switchyard is "oversized" and "may induce other energy projects to foreseeably blanket the area." Although they cite many record pages, they do not explain how those pages support their point. (Rule 8.204(a)(1)(B); cf. *Stop Syar, supra*, 63 Cal.App.5th at p. 459 ["list of string cites to the administrative record without explanation" was insufficient to establish exhaustion].) Even if we consider their citation to the August 17, 2021 memorandum from ZGlobal Power Engineering & Energy Solutions (ZGlobal), it just opines the *Project* was larger than needed (which, as we will explain, the County was not required to accept). *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, also cited by Appellants here, is distinguishable. (*Id.* at p. 1336 [city improperly failed to obtain EIR for roadway project whose purpose was to spur development; construction could not "be considered in isolation from the development it presages"].)

Additionally, Appellants argue the Project's "35-year duration would outlast most of the aging residents of Jacumba – so for them it *is* effectively 'permanent.' " If Appellants are suggesting application of section 2888(a) turns on local demographics, they provide no reasoned argument or authority for this interpretation, and the County could still reject it.

---

7    Appellants also state here that the Project would remove "remaining dairy and ranch" structures. Respondents contend the point is moot because they were demolished in 2021, but cite no evidence for this. That said, the FEIR indicated the structures had "potentially hazardous levels of asbestos and/or lead-based paint"—suggesting demolition was a distinct possibility, regardless of the Project.

Second, Appellants argue the County cannot enforce removal under section 2888(a), because it will no longer control the Switchyard Facilities. As noted, the County could impliedly find they were a Minor Impact Utility subject to section 2884, which does not require removal. Appellants' reliance on a case concerning contracts under an unrelated law is misplaced. (See *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1130, 1146 [contract under the Williamson Act, designed to "preserve open space and agricultural land" must "enforceably restrict" land (italics omitted)].)

Third, Appellants then acknowledge the County viewed the Switchyard Facilities as a Minor Impact Utility subject to section 2884, and dispute this treatment. As noted, section 1355 indicates Minor Impact Utilities have "a local impact on surrounding properties and are necessary to provide essential services."

On local impact, Appellants contend the Project entails a "600-acre industrial use" with a "major, regional" impact—but only the Switchyard Facilities are at issue. Appellants' conclusory assertion on reply that they are "imbedded" in the Project does not establish otherwise.

On necessity for essential services, Appellants argue the Switchyard Facilities do not provide electricity locally. Section 1355 does not state the services must be supplied locally; even if that were a reasonable interpretation, the County would not have to adopt it; and there was evidence for local benefit. An August 16, 2021, BayWa technical memorandum to the Board regarding energy issues noted the Project would "create additional reliability" for Jacumba. Appellants also argue the Switchyard Facilities "duplicate[ ] the ECO Substation three miles away," citing that project's 2011 EIR (stating a goal of providing a regional substation); the ZGlobal

26

memorandum (which opined the Project could use that substation); and a document showing other projects seeking connections to it. However, the EIR for *this* Project assessed an ECO Substation Connection Alternative, and found it was "potentially infeasible," including because it was unknown if SDG&E would allow use of its transmission line easement. We will not reweigh the evidence. (See *Sequoyah, supra*, 23 Cal.App.4th at p. 720.)

Appellants further argue that allowing "this enormous industrial use" under section 2884 would conflict with various other provisions (i.e., the General Plan's SPA designation; section 2888(c), which applies when a specific plan is in effect; and, on reply, section 2888(a), when used with section 7352(b).) These arguments amount to a reiteration of Appellants' belief that the Project was too large and would last too long. That does not establish the County's zoning determinations were unreasonable. The authority cited by Appellants is also inapposite. (See *Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1184 [conditional use permit may be ultra vires if general plan does not conform to pertinent statutory criteria]; compare *Elysian Heights Residents Assn., Inc. v. City of Los Angeles* (1986) 182 Cal.App.3d 21, 31 [rejecting reliance on *Calaveras* to have building permits declared void; permits were obtained "consistent with then existing zoning laws"].)

Finally, we address a remaining point by Appellants. They argue the FEIR "admits the Project is not consistent with the Zoning Ordinance," citing the statement that the Project site must " 'return to a use that is consistent with the . . . Zoning Ordinance at the time of dismantling' " and similar language in the Planning Commission Hearing Report. The FEIR was explaining the zoning determinations, and the Planning Commission was recommending the Project for adoption; their comments cannot reasonably be

27

construed as an implicit admission of zoning inconsistency. Viewed in context, including the specific dismantling and recycling requirements in the FEIR, the statements reasonably mean the *post*-dismantling use also must be consistent with the Zoning Ordinance.

## III. *CEQA*

Appellants argue there was no stable project description due to late solar panel changes, and, for this and other reasons, the FEIR failed to adequately consider a reduced project alternative. They also argue the FEIR did not adequately analyze and/or mitigate various environmental impacts. They do not establish any error under CEQA.

### A. *Applicable Law*

#### 1. *CEQA and the EIR*

" ' "The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved." ' " (*Save Our Access v. City of San Diego* (2023) 92 Cal.App.5th 819, 842.)

The "purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511-512

28

(*Sierra Club*).) "An adequate description of adverse environmental effects is necessary to inform the critical discussion of mitigation measures and project alternatives at the core of the EIR." (*Id.* at p. 514; *ibid.*, citing Guidelines, § 15151[8].) An EIR also must contain an " 'accurate, stable and finite' " project description. (*SOMA, supra*, 33 Cal.App.5th at p. 332.)

> 2. *Standard of Review*

" 'In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision.' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 723 (*SWRCB Cases*).) The "burden is on the party challenging the EIR to show it is inadequate." (*Plant Society, supra*, 172 Cal.App.4th at p. 626.)

"The standard of review in a CEQA case. . . is abuse of discretion." (*Sierra Club, supra*, 6 Cal.5th at p. 512.) An " 'agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides,' " which is reviewed de novo, or " 'by reaching factual conclusions unsupported by substantial evidence.' " (*Ibid.* [on substantial evidence review, we " ' "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for . . . our task "is not to weigh conflicting evidence and determine who has the better argument." ' "].)

The issue of "whether an EIR's discussion of environmental impacts is adequate" does "not fit neatly within the procedural/factual paradigm." (*Sierra Club, supra*, 6 Cal.5th at p. 513.) The "ultimate inquiry. . . is whether the EIR includes enough detail 'to enable those who did not participate in its

---

8      References to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.), unless noted.

preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Id.* at p. 516.) "The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference." (*Ibid.*) "[T]echnical perfection or scientific certainty" are not required. (*Id.* at p. 515.) Further, " '[i]nsubstantial or merely technical omissions are not grounds for relief. [Citation.] "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." ' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 942 (*Banning Ranch*).)

"[I]n a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' (citation)," the agency's conclusion is "reviewed . . . for substantial evidence." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).)

B.    *Project Description and Alternatives*

1.    *Additional Facts*

The DEIR described the Project as a "solar energy generation and storage facility" with a "capacity of up to 90 MW [megawatts] of AC [alternating current] generating capacity." The proposed footprint was 643 acres, with "[a]pproximately 300,000 photovoltaic (PV) modules" (i.e., solar panels). The DEIR stated "final PV module selection would be determined during the . . . Project's final engineering process."

30

The following objectives were identified: to develop a solar energy and storage project with a 90 MW AC capacity; maximize an applicable federal tax credit; support the state's renewable energy generation and storage goals; develop a "utility-scale solar energy project" that "improves electrical reliability for the San Diego region" and "supports the economy by investing in the region and creat[ing] construction jobs"; and situate the Project in an area with "excellent solar attributes."

The DEIR analyzed the Community Buffer Alternative, Reduced Project Alternative, and a No Project Alternative. It also addressed and rejected six alternatives because "they did not accomplish most . . . objectives" or would cause greater impacts.[9]

The FEIR continued to describe the Project as a solar generation and storage facility, and listed the same objectives as the DEIR. It indicated the footprint was reduced due to the increased setbacks, with the Community Buffer Alternative now at 604 acres. The FEIR also addressed the solar panels, stating the DEIR was based on using monofacial panels, explaining the Project would now use modules that were bifacial and had increased wattage (385 watts to 540 watts), and describing the bifacial panel dimensions. But it also still said the proposed Project would use "[a]pproximately 300,000" solar panels, which Respondents contend here was "accidental[ ]" and a "scrivener's error."

---

9      These were: the ECO Substation Connection Alternative (No Switchyard) (noted above); Energy Efficiency Ordinance; Distributed Generation and Storage Policy (Rooftop Solar Panels); Wind Energy; Alternative Locations; and Community Buffer with Southwest Corner Expansion.

The FEIR summary and sections on energy impacts, emissions, and project alternatives all noted the use of bifacial panels and increased wattage. Each cited Appendix V to the FEIR, titled "Energy Generation Technical Memorandum" (Appendix V). Prepared by BayWa, it stated the "amount of electricity that a facility will produce" (i.e., direct current or DC) differs from the "power capacity (nameplate capacity)" (i.e., AC), and standard DC/AC ratios range from 1.2 to 1.4. It noted both power generation and the DC/AC ratio "depend[ ] [on] site conditions" and other issues. It explained the Community Buffer Alternative could still supply 90 MW AC on its reduced footprint of 604 acres, because there was "sufficient acreage" for a ratio of 1.2 to 1.4 (indicating the ratio was 1.23, based on 110.57 MW DC). Addressing whether a "more significant [acreage] reduction" could still yield 90 MW AC, it stated the Community Buffer Alternative was "very close to the minimum" ratio and a "20% reduction in acreage could be expected to reduce AC nameplate capacity by approximately 20%."

In analyzing the project alternatives, the FEIR determined the Community Buffer Alternative would "generally meet all project objectives," and reiterated "[t]echnological improvements (bifacial modules and increased module wattage)" would allow it to maintain 90 MW AC capacity. It found the Reduced Project Alternative would have a 23 percent reduction to the footprint, with a "corresponding reduction" in AC capacity to 70 MW. It further found battery storage capacity "would also likely be reduced," and although this alternative would generally meet project objectives, it would not achieve most objectives "to the extent" of the proposed Project.[10]

---

10    It also rejected the six additional alternatives, and three more alternatives in responses to comments ("Reduced Project – Northern Focus

The Planning Commission Hearing Report noted the change to bifacial panels, and said the Community Buffer Alternative would use 291,000 solar panels.

The Board hearing was set for August 18, 2021. On August 16, appellant Osborne sent an e-mail to a County supervisor and staff. He asserted the "math is off," citing Appendix V and two other solar projects (Viking Energy in Imperial Valley and Aramis Solar in Livermore Valley), and stated the Project "only really needs to be about 360-375 acres to get 90MW." The following day, counsel for Human Kind sent the Board a letter raising similar concerns, and also citing Appendix V.

Also on August 16, BayWa provided a further energy memorandum (noted in our zoning discussion) that addressed the solar panel number and other solar projects. It said the 300,000 figure was "based upon the initial design," with 385-watt panels; 540-watt panels are larger; and the "site cannot fit 300,000 540 W modules." It stated the Community Buffer Alternative "would install approximately 200,000 to 220,000 modules . . . ." As for the other solar projects, it provided a comparison chart with several projects including Viking, Amaris, and Jacumba Solar, showing a range of 9.6 to 4.1 acres-per-MW AC ratio (with the Project at 6.71). But it also explained the Project's "acres-to-MW ratio cannot be extrapolated" from other projects, because output depends on the "technology" and "environmental constraints." It noted a "major constraint on the Project's acres-to-MW ratio" is the site's "irregular shape," which renders the periphery unusable, and that it is "broken into 4 distinct areas" causing "more peripheral requirements such as fence, setbacks, and roads."

Alternative"; "Jacumba Community Alternative"; and "Reduced PV Panel Height Alternative").

33

On August 17, ZGlobal submitted a letter regarding energy and other issues (also noted in our zoning discussion), which addressed the solar panel information in the FEIR and Appendix V.[11] It cited the 300,000 solar panel number (and 291,000 Community Buffer number) to assert the Project will be "overbuilt for 90 MW AC" delivery. It stated that with 540 watt panels and a DC/AC ratio of 1.28, a total of 213,864 panels will be needed (or 208,600 panels, at a 1.25 ratio). It also asserted only 487 or 475 acres would be needed, based on panel dimensions and a "20% security factor."

At the Board hearing on August 18, an attorney for developer JVR addressed ZGlobal's view that the Project would be overbuilt, stating that was based on 300,000 panels and confirming they would use "between 200,000 and 220,000" panels.

The County adopted the Community Buffer Alternative. In its CEQA Findings, it found this alternative "lessens significant impacts . . . while still achieving the objectives of the Project." It found the Reduced Project Alternative was infeasible for multiple, independent reasons, including that it would "generate less energy"; "reduce the number of jobs that would be created"; "lessen . . . energy storage capabilities," and reduce the Project's ability to assist the state in this regard; and "fail to fully utilize an area of the County with high Direct Normal Irradiation" (thus also failing to maximize clean energy generation).

---

[11] Respondents contend "ZGlobal does not attest to any expertise designing utility scale solar projects." The ZGlobal letter's author, Brian Rahman, listed his title as Executive Director of Engineering and stated he has "been directly involved with renewable project developments over the past 15 years."

In the MUP, the County described the Project as a 604-acre solar facility with a capacity of 90 MW AC, but still indicated there would be 291,000 solar panels.

2.    *EIR Project Description*

Appellants contend the Project did not have a stable description, because "at the last minute JVR altered the number and type of PV panels." This argument does not fairly describe the record, and we are not persuaded by it.

" '[A]n accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR.' " (*SOMA, supra*, 33 Cal.App.5th at p. 332, italics omitted.)  "The description must include the project's precise location and boundaries; a statement of the project's objectives and underlying purpose; a general description of the project's technical, economic, and environmental characteristics; and a statement describing the EIR's intended use.  (Guidelines, § 15124, subds. (a)-(d).)  "Whether the EIR contains an accurate and stable project description is a question of law subject to de novo review."  (*Save Our Capitol! v. Dept. of Gen. Services* (2023) 87 Cal.App.5th 655, 673 (*SOC*).)  The "governing principal is whether the project description may have thwarted the public's ability to participate in the process and comment meaningfully on the EIR."  (*Id.* at p. 674.)

We conclude the EIR provided an accurate, stable, and finite project description, notwithstanding the solar panel changes and the lack of an updated panel number in the FEIR and MUP.

The Project was consistently described as a solar energy generation and storage facility with a capacity of 90 MW AC, and there were no changes to its location or objectives.  (See, e.g., *Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1179 (*Carpenters*) [project

35

"from inception through approval, was a mixed-use commercial/residential project"; only changes were "composition and ratio of the residential to commercial footprint," but "overall size . . . remained consistent, and the site remained the same"]; *SOMA, supra*, 33 Cal.App.5th at pp. 333-334 [EIR "described one project—a mixed-use development . . . with two options for different allocations of residential and office units"].)

Although the Project size was reduced, the FEIR explained why: increased setbacks were incorporated, and comparable energy capacity was possible by using bifacial solar panels with increased wattage (540 watts, rather than 385). (Cf. *Carpenters, supra*, 76 Cal.App.5th at pp. 1184–1185 [final EIR "by necessity will contain new information"].) Appendix V to FEIR, cited repeatedly within it, supplied further information on energy capacity, including explaining why less acreage would be insufficient. (See *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1239 [EIR text "should refer to the appendices that contain the relevant discussion"].) The FEIR also noted the bifacial, higher-wattage solar panels in its analysis of project alternatives, reflecting it considered the correct panels in this regard.

After public comments indicated the FEIR still said there were 300,000 panels, BayWa clarified this was not possible given the size of the 540-watt panels and there would only be 200,000 to 220,000 panels. This was consistent with ZGlobal's estimate that using 540-watt panels to achieve 90 MW AC should require 208,600 to 213,864 panels. Respondents' position—that the lack of an updated panel number in the FEIR was a scrivener's error—is thus supported by this record. (Cf. *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 758 [agreeing omission was " 'at most, a scrivener's error' "].) Appellants do not establish

36

this typographical error, or BayWa's subsequent clarification, impaired the "public's ability to participate in the process and comment meaningfully on the EIR." (*SOC, supra*, 87 Cal.App.5th at p. 674; see *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 292 (*East Sacramento*) [petitioner "failed to show . . . slight increase in housing units precluded meaningful decisionmaking or public comment"]; *City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 542-543 [lack of updated traffic analysis did not render jail expansion project description unstable].)

For similar reasons, Appellants also do not establish the related typographical error in the MUP (i.e., stating there would be 291,000 panels) reflected any impediment to the County's decisionmaking. (See *East Sacramento, supra*, 5 Cal.App.5th at p. 292; cf. *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 226 [that "overall water usage on the [p]roject may have been understated in the DEIR would not appear to preclude informed decisionmaking"].)

Appellants' remaining arguments do not persuade us to reach a different result.

First, Appellants contend the "public objected repeatedly to the County's confusing and conflicting descriptions of the Project's parameters." They rely on a string of record citations without explanation (Rule 8.204(a)(1)(B)), and the citations do not support the point anyway. Two are DEIR comments; in one, a community group inquired about the solar panel selection, and in the other, Human Kind's counsel objected to the proposed Project scope. One citation is to the Planning Commission Hearing Report, which noted the change to bifacial panels, but did not state there was public concern. The remaining documents are the August 2021 letters from

37

Appellant Osborne and ZGlobal. If anything, these letters confirm the public was able to comment on the use of the bifacial, higher-wattage panels, and their implications for the Project. (See *SOC, supra*, 87 Cal.App.5th at pp. 673-674.)

Second, citing the August 2021 BayWa memorandum, Appellants contend JVR only belatedly admitted other projects used less acreage; the County had a "duty to ascertain" if JVR could "reduce its acreage and . . . achieve its 90 MW target"; and these issues contributed to the County's alleged failure to consider if the Reduced Project Alternative could attain the Project objectives. We disagree. The BayWa memorandum made clear that acreage-to-MW ratios from other projects could *not* be extrapolated to this Project. Further, BayWa and ZGlobal agreed on the approximate number of 540-watt panels needed; they disagreed on the acreage required, and only BayWa addressed issues like the site's irregular shape. (Cf. *Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 851 [criticism of study in EIR "amount[ed] to nothing more than a disagreement among experts"].) More generally, the record reflects the County had adequate information about the solar panels and Project space requirements, including in the FEIR, to assess the Reduced Project Alternative.

Finally, the cases cited by Appellants involve significant shifts in project descriptions and are thus distinguishable. (See *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 197, 199 [description of "small-scale groundwater" extraction was "dwarfed" by broader proposals elsewhere in EIR; "incessant shifts among different project descriptions . . . vitiate[d] the . . . process as a vehicle for intelligent public participation"]; *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 652-654, 665-666 (*Kawamura*) [state agency certified EIR to eradicate an invasive pest, but

38

" 'at the last minute' " approved a program to control it, and EIR had declined to evaluate the control alternative]; *SOC, supra*, 87 Cal.App.5th at pp. 670, 678 [description for State Capitol Annex replacement "satisfied . . . CEQA except with its description of the new Annex's exterior design," which was not disclosed to be glass until final EIR; this impeded public input on "project's most controversial aspect—its impact on historical resources"].)

        3.     *Analysis of Alternatives*

Appellants contend the County lacked a reasonable explanation for rejecting the Reduced Project Alternative. We disagree.

An "EIR must 'describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . .' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162-1163.) The " 'range of feasible alternatives shall be selected and discussed in a manner to foster meaningful public participation and informed decision making.' " (*Kawamura, supra*, 243 Cal.App.4th at pp. 666-667.) "Courts will defer to an agency's selection of alternatives unless the petitioners (1) demonstrate that the chosen alternatives are ' " 'manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives,' " ' and (2) submit evidence showing the rejected alternative was both 'feasible' and 'adequate,' because it was capable of attaining most of the basic objectives of the project . . . ." (*SOMA, supra*, 33 Cal.App.5th at p. 345.)

First, Appellants argue the County rejected the Reduced Project Alternative "without a reasoned explanation supported by the record as to why [its 481 acres] was too small," and "erroneously assumed" it would yield only 70 MW AC capacity and greater acreage was needed for 90 MW. As noted above, they also contended the County failed to address if this

alternative could feasibly attain most Project objectives. These contentions lack merit. The BayWa memoranda (Appendix V to the FEIR, and in August 2021) supplied evidence, not just assumptions, to support these energy capacity findings. But capacity was not the only focus of the alternatives analysis. Rather, the FEIR fully analyzed the Reduced Project Alternative, and found it would not achieve most objectives to the same extent as the proposed Project. The County then found the Reduced Project Alternative was infeasible for multiple reasons, including reduced job creation and energy storage.

Appellants have not shown the County's adoption of the Community Buffer Alternative was unreasonable, or that there is evidence the Reduced Project Alternative could "attain[ ] most of the basic objectives of the project." (*SOMA, supra*, 33 Cal.App.5th at p. 345.) We therefore defer to the County's selection. (*Ibid.*) Further, the cases Appellants cite involve failures to discuss alternatives, which did not occur here. (See *Kawamura, supra*, 243 Cal.App.4th at pp. 666, 669-670 [EIR failure to assess "control" as alternative to pest eradication project "infected the entire EIR"]; *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1305 [EIR "failed to discuss *any* feasible alternative . . . that could avoid or lessen the significant environmental impact of the project on the City's water supply"].)

Second, Appellants also state in the factual summary of their opening brief that "roof-top PV panels coupled with batteries" are a feasible alternative to a solar project. This assertion does not meet appellate briefing standards and the reply brief section on rooftop solar is too late (Rule 8.204(a)(1)(B); *Badie, supra*, 67 Cal.App.4th at pp. 784-785; *Raceway, supra*, 2 Cal.5th at p. 178.) Moreover, Appellants do not address the FEIR's

40

rejection of the "Distributed Generation and Storage Policy (Rooftop Solar Panels)" alternative (i.e., for being outside County control and insufficient to meet most objectives), nor show that this rejection was erroneous.

C.     *Biological Resources*

Appellants contend the County did not sufficiently consider the input of wildlife agencies, and did not adequately analyze and/or mitigate multiple biological resource impacts (i.e., tricolored blackbird; vegetation communities; "pseudo-lake" effect; "heat island" effect; and wildlife connectivity).[12] They do not establish any lack of analysis or sufficient mitigation.

1.     *Additional Facts*

The County, the California Department of Fish and Wildlife (CDFW), and the United States Fish and Wildlife Service (USFWS) were parties to a "Planning Agreement for the North and East County Multiple Species Conservation Program (MSCP) [P]lans" (MSCP Planning Agreement). It incorporated an Interim Review Process to ensure development projects did not compromise future MSCP Plans. That process stated, in part, that within 30 days after a project review meeting, the agencies "shall provide input to the [County] as to whether either agency believes the project may potentially conflict with the conservation objectives of the [MSCP] Planning Agreement."

As later described in the FEIR, the County met with the wildlife agencies on April 18, 2019 and March 19, 2020 to discuss the Project, and the agencies "did not provide a list of follow up comments or questions within 30 days" after either meeting.

_____

[12]     Appellants' arguments regarding the biological impacts and easement overlap somewhat. We address each properly-raised point once, and do so in the place that seems most logical for our discussion.

In December 2020, CDFW and USFWS provided comment letters on the DEIR. CDFW's letter was lengthy, and we address certain portions in later sections. Pertinent here, it identified impacts to "Species of Special Concern" (SSCs or special-concern species) including the tricolored blackbird, burrowing owl, and others. It recommended the County "include SSC-specific mitigation measures" in the FEIR, including surveys, and that the County require a "tricolored blackbird mitigation plan" be submitted to CDFW for review. USFWS provided a brief letter addressing avian mortalities at solar facilities, and attached a 2016 federal report on the issue. It recommended a "Bird and Bat Conservation Strategy," including "post-construction mortality monitoring."

The FEIR addressed biological impacts and mitigation in detail, and included an appendix with a biological resources technical report. The FEIR stated information was obtained through a literature review that included CDFW and USFWS databases, as well as field surveys by Dudek biologists. The surveys included "habitat assessment and focused surveys for burrowing owl" and other species. The FEIR found the Project was "planned in accordance with the [MSCP] planning principles" and in "consideration of . . . a future MSCP East County Plan," and included a table showing areas of MSCP consistency. It also found, as noted, that the agencies did not follow up with the County within 30 days of their meetings, as contemplated by the Interim Review Process.

On mitigation, the FEIR described eleven measures, including biological monitoring (M-BI-1); habitat preservation through the biological easement (M-BI-3); a Resource Management Plan for "long-term management" of the easement (M-BI-4); a measure to avoid impacts to

42

nesting and burrowing birds, and certain other animals, which included pre-construction surveys (M-BI-5); and bat surveys and avoidance (M-BI-6).

The FEIR also provided detailed responses to the agencies. Among other things, it acknowledged CDFW's concern about special-concern species surveying and that it recommended CDFW review of a tricolored blackbird mitigation plan. For the special-concern species, it noted mitigation measures already incorporated surveys, and said M-BI-5 was revised to provide additional surveying and relocation. For tricolored blackbird mitigation, it cited M-BI-3 and M-BI-4, and said clarifying text was added to the FEIR regarding impacts to their foraging habitat. Regarding USFWS's input on avian mortalities, the FEIR explained that risk was low here (as we discuss *post* in addressing the "pseudo-lake" effect). As for USFWS's recommended "Bird and Bat Conservation Strategy," the FEIR found it was not required, citing existing mitigation measures that would reduce bird and bat impacts below significance.

At the August 18, 2021, Board hearing, a County staff member stated the Board received a letter from CDFW "late yesterday evening." The record contains what appears to be this letter (although it is dated August 18, not August 17). CDFW "apologiz[ed] for the lateness," and sought to identify "shortcomings" with the Project and "disagree with some responses" to its December 2020 letter. For example, it noted the Project had not done small mammal trapping, but rather proposed preconstruction surveys, and it was thus "unknown if the proposed habitat conservation" would be sufficient. It also noted it recommended the County "require a tricolored blackbird mitigation plan be submitted to CDFW," and there had been no such outreach. Additionally, CDFW said it "would appreciate additional time" to meet with the County and USFWS before Board approval, regarding impacts

43

to species potentially covered under "forthcoming East County [MSCP]," and stated this would "be consistent" with the MSCP Planning Agreement. The County staff member described and responded to the letter at the hearing.

    2.    *Wildlife Agency Input*

Appellants contend in their opening brief that CDFW and USFWS "took issue with [the] adequacy" of the EIR analysis, citing their DEIR comments. They then cite CDFW's August 18, 2021 letter to contend it "timely advised" the County of Project shortcomings, including the County's purported "failure to abide" by the MSCP Planning Agreement or "conduct[ ] the surveys, [or] provide[ ] the mitigation measures required under that agreement . . . ." Appellants do not establish the FEIR's analysis of wildlife impacts is deficient based on the agency input.

As a preliminary matter, Appellants did not meet their burden in briefing this issue, and we deem it forfeited. Their opening brief does not fairly address the substance of these agency DEIR comments or FEIR responses, the FEIR discussion of the MSCP Planning Agreement, or CDFW's August 18 letter, and their newly raised contentions on reply, including as to small mammal trapping, are too late. (Cf. *Plant Society, supra*, 172 Cal.App.4th at p. 626 ["burden is on the party challenging the EIR to show it is inadequate"]; cf. *SWRCB Cases, supra*, 136 Cal.App.4th at p. 790 ["To successfully challenge the EIR, the . . . parties need to show that the EIR does not adequately address specific mitigation measures . . . . They cannot make that showing if they ignore the EIR, as they have here." (Italics omitted.)]; *Raceway, supra*, 2 Cal.5th at p. 178.)

Even if the issue were not forfeited, the arguments lack merit.

First, the fact that wildlife agencies raised concerns about the DEIR does not mean the FEIR's wildlife analysis or mitigation was inadequate.

(Cf. *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 643 (*North Coast*) [" 'evidence of a disagreement with other agencies is not enough' " to show lack of support for CEQA findings]; *Plant Society, supra*, 172 Cal.App.4th at p. 626 [accord, reduction of impacts from mitigation].)

Here, the FEIR explained how the biological information was collected, set forth a number of mitigation measures, and provided thorough responses to the DEIR comment letters. The County was entitled to rely on this showing, notwithstanding agency concerns. (See *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 267, fn. 22 (*California Oak*) [CEQA " 'does not require a lead agency to . . . perform all recommended research"; " 'that additional studies might be helpful does not mean that they are required' "]; *North Coast, supra*, 216 Cal.App.4th at p. 643 [reversing EIR inadequacy finding based on district's failure to follow water sampling recommendation]; *Banning Ranch, supra*, 211 Cal.App.4th at p. 1233 [city did need not "acquiesce to different mitigation measures" proposed by federal agency or "anyone else"].)

Second, Appellants' contentions regarding CDFW's August 18 letter are unpersuasive as well. On timing, we disagree the letter was timely for purposes of agency input, just because it was filed during the administrative proceeding (as Appellants suggest). Indeed, CDFW acknowledged its "lateness."

On the substance, CDFW did not state the County "fail[ed] to abide" by the MSCP Planning Agreement. It said that allowing additional time to meet with the agencies before final approval would "be consistent" with the agreement. The County could reasonably disagree. It met with the agencies in 2019 and 2020; they did not timely follow up under the Interim Review

45

Process; and it could find CDFW's request for extra time on the day before final approval was too late. CDFW also did not state its recommended surveys and mitigation measures were based on the MSCP Planning Agreement (as Appellants imply), and Appellants do not establish any failure to consider this input regardless. CDFW did raise surveys and mitigation in its DEIR comment, but the FEIR responded, and when the CDFW pursued the issues in its August 18, 2021, letter, county staff addressed them at the hearing.

      3.    *Tricolored Blackbird Habitat*

Appellants contend the FEIR "glosses over the Project's destruction of at least 593 acres of tricolored blackbird foraging habitat," "dismisses this impact as insignificant because other habitat would remain," and "ignores . . . that this species became imperiled due to habitat loss . . . ." They also contend the biological easement is inadequate to mitigate these and vegetation impacts. Appellants do not establish either the analysis or easement mitigation measure was inadequate.

We begin with the FEIR analysis. CDFW's comment letter on the DEIR noted the loss of foraging habitat, and asked for clarification. The FEIR acknowledged the "loss of foraging habitat is identified as one of the reasons for the decline in tricolored blackbird," and the Project "would impact 593.5 acres of potential foraging habitat for tricolored blackbird . . . within the Project site." It explained potential foraging habitat did remain, citing studies regarding their habitats (and habits), and stating there were hundreds of acres on-site and thousands of acres within miles of the Jacumba pond (where the tricolored blackbirds were previously seen nesting).

But the FEIR further acknowledged the impact on tricolored blackbirds would be "potentially significant," and, as noted, identified the biological

46

easement and Resource Management Plan as mitigation measures. The FEIR stated the easement had over 420 acres of "suitable foraging habitat" (including "[n]atural insect populations" in its vegetation communities), and the final Resource Management Plan required tricolored blackbird monitoring. It elsewhere noted the "tricolored blackbird was observed in the [biological] easement," and the vegetation types being used for mitigation in the easement were "expected to provide foraging habitat" for species including them. It was through mitigation that the FEIR found the "impacts would be reduced to less than significant."

We conclude this analysis was sufficient. (*Sierra Club, supra*, 6 Cal.5th at pp. 514, 516.) The portion of *Vineyard* cited here by Appellants involved an insignificance finding, not mitigation below significance, and does not offer guidance here. (*Vineyard, supra*, 40 Cal.4th at pp. 448-449 [no substantial evidence that river habitat impacts were insignificant].)

Appellants also do not show the biological easement was insufficient to mitigate impacts to tricolored blackbirds or vegetation communities. The FEIR stated the easement would encompass 435 acres "of sensitive vegetation communities, special-status plant species, and habitat for special-status species," and "preserv[e] compensatory habitat that provides equal or greater benefit to plant and wildlife species." As noted, the Resource Management Plan for the easement included tricolored blackbird monitoring; it also included special status plant mitigation. In the MUP, the County found "[b]iological impacts will be mitigated by an on-site open space easement area which will preserve 435 acres of existing vegetation in perpetuity." Its CEQA Findings similarly stated "[i]mpacts to biological resources . . . would be reduced to less than significant with suitable mitigation."

47

First, Appellants argue that mitigation that "prevents additional habitat loss" does not "undo" net habitat loss, citing a CEQA policy to " '[p]revent the elimination of . . . wildlife species' " due to human activity. (§ 21001, subd. (c).)  They analogize to an apartment building, contending that "removing one block of apartments . . . is not reduced to insignificance" by promising not to remove another block.  To the extent Appellants are disputing habitat easements are suitable for biological mitigation, we disagree.

"CEQA does not require mitigation measures that completely eliminate the environmental impacts of a project.  Rather, CEQA permits mitigation measures that would substantially lessen the significant environmental effects of the project.  [Citation].  The Guidelines, in turn, provide that mitigation may include '[c]ompensating for the impact by replacing or providing substitute resources or environments . . . .' " (*Save the Hill, supra,* 76 Cal.App.5th at p. 1117.)

Habitat preservation has been used to mitigate impacts for wildlife and vegetation.  (See *Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 125 (*Kings River*) [case law has "recognized offsite preservation of habitats for endangered species as an accepted means of mitigating impacts on biological resources"]; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 495-496 [coastal sage scrub was adequately mitigated through on-site habitat preservation and other measures, notwithstanding net loss of 0.23 acres].)  Further, " 'mitigation need not account for every square foot of impacted habitat to be adequate.' " (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 527-528 [disagreeing that preserving wildlife habitat at a particular ratio was inadequate; substantial evidence supported "determination that . . .

48

mitigation lands appropriately reduced" impacts to species]; see *Banning Ranch, supra*, 211 Cal.App.4th at pp. 1232-1233 [coastal sage scrub mitigated at 2:1 ratio].)

Appellants' reliance on *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814 is misplaced. The case involved an *agricultural* conservation easement, and held it was inadequate to mitigate extensive farmland impacts (but, rather, merely "prevents the future conversion" of land). (*Id.* at p. 875.) *Save the Hill* rejected the plaintiff's reliance on *King & Gardner* to challenge a habitat easement, not just due to the greater acreage loss (as Appellants suggest)—but, "[m]ore importantly," based on the CEQA mitigation principles discussed above. (*Save the Hill, supra*, 76 Cal.App.5th at pp. 1114, 1117; *id.* at p. 1116 [offsite easement was adequate compensatory mitigation for permanent habitat loss].)[13]

Second, Appellants argue agencies must assure mitigation "provides a 'substitute' for habitat loss," and summarily assert the EIR "never demonstrated that the wildlife whose known habitat will be destroyed will ever use the different habitat . . . ." They further assert an "actually

---

[13] Appellants' other arguments regarding *Save the Hill* fare no better. They claim it recognized a habitat easement is "functionally similar" to an agricultural one and subject to similar scrutiny, but just cite its parenthetical description of *Kings River* (which mentioned only similar function, not scrutiny). (*Save the Hill, supra*, 76 Cal.App.5th at p. 1117.) Appellants also suggest the easement discussion was dicta because the plaintiff abandoned its claim, but the abandoned habitat claim appeared to be a different issue and, either way, the court still elected to address it. (Compare *id.* at p. 1113 [adequacy of mitigation analysis for shrimp habitat], with p. 1117 [adequacy of offsite mitigation]; cf. *Masry v. Masry* (2008) 166 Cal.App.4th 738, 741 [dicta "can be persuasive"].)

49

'comparable' " habitat "will already be fully occupied, because nature abhors a vacuum."  (Italics omitted.)

The adequacy of a mitigation measure is a factual issue, subject to substantial evidence review, and these unsupported assertions are not enough to place the issue before us (nor are Appellants' newly raised points on reply).  (*Vineyard, supra*, 40 Cal.4th at p. 435; *Defend the Bay, supra*, 119 Cal.App.4th at p. 1266 [appellant "challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking," and "[f]ailure to do so is fatal"]; *Raceway, supra*, 2 Cal.5th at p. 178.)

Nonetheless, we note the FEIR did discuss evidence supporting tricolored blackbird use of the biological easement, including studies regarding their foraging habitats, findings that the vegetation and its insect populations would provide such habitat, and a finding that tricolored blackbird was observed in the easement area.  (See *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 ["The biological report (which discusses the field survey, the [agency database] query and the conclusions [the biologist] reached from this data) constitutes substantial evidence supporting the determination reached in the FEIR and the finding adopted by the board that, as mitigated, the dairy will not significantly affect the kit fox."].)

Third, Appellants argue the biological easement is "merely the site acreage that is too steep, rocky, uneven or isolated" to be utilized for the solar panels, citing a map of the Project site.  Respondents argue this claim is "misleading," and state the easement has a number of vegetation communities, waters to provide hydrologic connections, and adjacent

50

parkland. Appellants do not establish the selection of the easement land undermines its adequacy for mitigation purposes.

Finally, we address a point raised by Respondents. They contend the tricolored blackbird issue is moot because their nesting habitat at Jacumba Pond was destroyed, citing a June 2021 Dudek memorandum. The memorandum stated the pond was their "only known nesting location" in this part of the county; it was converted for human recreation, with vegetation changes; and if it was not restored, the Project "would not result in any impacts to tricolored blackbird." Although we already concluded Appellants have not established error as to the tricolored blackbird, the memorandum provides further support for affirmance. (Cf. *Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370, 377–378 [preparation of EIR for tree removal project was moot, where removal and replacement was complete].)

4. *Vegetation Communities*

Appellants also contend the FEIR erroneously found the biological easement mitigated impacts to desert saltbush scrub, tamarisk scrub, and fallow agricultural land, based on unmet mitigation ratios. However, as Appellants acknowledge on reply, the FEIR used " 'out-of-kind' " mitigation to meet these ratios. Although we deem forfeited their belated attempt to show out-of-kind mitigation was inadequate (*Raceway, supra*, 2 Cal.5th at p. 178), we elect to explain why it is unpersuasive.

The FEIR identified several vegetation communities on the Project site, including the three at issue (desert saltbush scrub, tamarisk scrub, and fallow agriculture), desert sink scrub, mesquite bosque, and more. In describing the biological easement mitigation measure (M-BI-3), the FEIR included a table with vegetation mitigation ratios, impacted acres, required mitigation acres, and easement acres. The desert saltbush scrub ratio was

51

2:1 (i.e., two mitigation acres per one impacted acre), tamarisk was 3:1, and fallow agriculture was 0.5:1. For each, the easement acres met only part of the mitigation acres, if at all.[14] But the FEIR explained mitigation would be "out-of-kind," and described how other vegetation communities would "be conserved as mitigation for impacts to desert saltbush scrub, tamarisk scrub and fallow agriculture."[15]

Responding to a CDFW comment on the DEIR regarding out-of-kind mitigation, the FEIR indicated use of the "out-of-kind vegetation communities" is "in accordance with the County's Guidelines for Determining Significant Biological Resources" (Biological Guidelines). It explained the County's Biological Guidelines "state[ ] that 'out of kind' habitat may be appropriate where the biological function and value of the habitat used for mitigation is similar" to the impacted habitat. The FEIR concluded impacts to sensitive vegetation communities would be reduced to less than significant with mitigation. CDFW's August 18, 2021 letter noted the out-of-kind mitigation, but stated only that impacts on special-concern species were unknown "absent a more complete biological inventory."

---

[14] The full table data was as follows: For desert saltbush scrub, the ratio was 2:1; the impact was 50.39 acres; required mitigation was 100.78 acres; and easement acreage was 4.69 acres. For tamarisk, the ratio was 3:1; the impact was 1.11 acres; required mitigation was 3.33 acres; and there was no easement acreage. For fallow agriculture, the ratio was 0.5:1; the impact was 467.63 acres; required mitigation was 233.82 acres; and easement acreage was 9.35 acres.

[15] For example, the desert saltbush scrub deficit "is mitigated through . . . desert sink scrub (12.43 acres), mesquite bosque (24.46 acres), and Sonoran mixed woody and succulent scrub (59.20 acres)."

As noted, the County found biological impacts would be reduced below significance with mitigation, including the biological easement. Its MUP findings included the FEIR table showing the vegetation mitigation ratios and related information, but did not describe the out-of-kind mitigation.

Even if we considered Appellants' belated arguments on reply, they do not show out-of-kind mitigation was inadequate here.

First, citing the vegetation mitigation table in the MUP findings, they argue the County's "specific habitat mitigation standards" cannot be "disregarded through . . . 'out-of-kind habitat,' " and "require a particular ratio of replacement habitat of the same kind . . . ." (Italics omitted.) But the County found the easement reduced biological impacts below significance, and adopted the EIR, so we can infer it found the out-of-kind mitigation utilized in the EIR adequate. Further, as the FEIR explained, the County's Biological Guidelines contemplate use of out-of-kind mitigation when appropriate.

Second, Appellants argue the "County's failure to adhere to its own requirements . . . prompted CDFW to object that . . . out-of-kind habitat" does not assure adequate mitigation for special-concern species, citing the August 18, 2021, CDFW letter. CDFW did not address the County's "own requirements," which, again, permit out-of-kind mitigation. Although CDFW did indicate impacts on special-concern species would be unknown without a further biological inventory, the County was not required to conduct one. (*California Oak, supra*, 188 Cal.App.4th at p. 267, fn. 22.)

### 5. *"Pseudo-Lake" Effect*

Appellants next argue the FEIR improperly dismisses as speculative USFWS's concern that the " 'pseudo-lake effect' " of solar energy projects

could impact avian mortality. Appellants do not establish the FEIR's analysis was inadequate or its conclusion unfounded.

First, the record reflects ample analysis of the pseudo-lake effect. USFWS's DEIR comment letter stated "[s]everal utility-scale solar projects in the Mojave Desert . . . reported significant avian mortalities," and attached a 2016 federal agency report. The report said researchers "hypothesized" birds try to land on solar panels "as though they were a body of water," and either perish from the collision or are unable to take off again. The report acknowledged recent studies mostly focused on wind energy; "no published studies . . . directly addressed" solar facilities; and use of "ad hoc methodologies" could lead to mortality estimates that are "insufficiently accurate" to inform conversations about impacts.

The FEIR addressed the pseudo-lake effect, including in response to USFWS and in the biological resources technical report. It found there was "little scientific information" on the effect, and a "detailed discussion of the impacts would be speculative." It also identified factors that would minimize collision risk: the Project site was not located near water, it was not a major part of the Pacific Flyway migratory path, and the solar panels would be "dark in color, coated to be non-reflective, and designed to be highly absorptive of all light" (so "may not appear like water"). In response to USFWS, the FEIR acknowledged the 2016 report, but reiterated there is a "low risk of a pseudo-lake effect." The biological technical resources report addressed the effect too, and noted the "lack of data" on avian impacts from solar facilities.

On August 16, 2021, Dudek provided a further memorandum on avian fatalities. It addressed a comment to the Planning Commission on the issue, which cited research studies and documents from another solar project, and

54

explained this information did not contradict the EIR findings.  It also described a recent study that did address avian fatalities at solar projects and found there was a lack of insight into their causes.  Dudek concluded "the EIR's conclusion remains accurate—a detailed discussion of avian collision risk with the Project's solar panels is speculative."

Accordingly, Appellants do not establish the EIR analysis was inadequate.  (*Plant Society, supra*, 172 Cal.App.4th at p. 626.)

Second, Appellants also contend the FEIR lacked support to conclude the pseudo-lake effect was speculative, citing the 2016 report attached to the USFWS comment.  But the FEIR acknowledged the 2016 report and still found the risk was low, and the Dudek memorandum addressed a later study that was consistent with the FEIR's conclusions.  (See *North Coast, supra*, 216 Cal.App.4th at p. 643 [agency disagreement insufficient to show lack of substantial evidence under CEQA].)  Appellants relatedly contend developer "JVR's claim that its experimental and unproven 'anti-reflective' panel coating would kill fewer birds, by contrast, lacks supporting agency review." The EIR did not state there would be avian fatalities that the coating would reduce; it found the coating was one reason fatality risk would be low in the first place.  Appellants cite no authority that another agency had to review that finding, and identify no other grounds to call it into question.

6.      *"Heat Island" Effect*

Appellants argue the FEIR mentions the "heat island" effect "only . . . in passing" and "ignor[es] the specific impacts on vulnerable birds and insects on which they feed."  Appellants do not establish the FEIR analysis is inadequate.

First, the FEIR did address the heat island effect, and reasonably determined it would not cause harm to the environment.

55

During the DEIR comment period, a number of commenters, including the California State Parks' Colorado Desert District and Anza-Borrego Desert State Park (State Parks), CDFW, and multiple individuals, raised concerns about the heat island effect. The State Parks stated "[l]arger solar power plants increase local temperatures" up to 4 degrees Celsius (i.e., around 40 degrees Fahrenheit), citing a 2016 journal article. CDFW stated "[l]arge solar panel arrays are known to emit levels of heat that can harm birds," citing a different study.

The FEIR addressed the heat island effect in global responses and responses to the commenters. Pertinent here, in a global response on the heat island effect, it acknowledged the solar panels would peak at 158 degrees in summer, but said they "are designed to absorb light energy" and cited a 2013 study finding panels cool at night, temperatures dissipate with height and distance, and a heat island effect was unlikely. The response addressed the 2016 journal article cited by the State Parks, noting it did not address "temperatures at a distance" and did involve "solar panels . . . over unvegetated ground" (whereas the Project site would be revegetated). The response concluded there was "no evidence any possible increase in ambient temperature . . . would significantly impact" the environment. In a separate global response on biological impacts, the FEIR determined "there are no known studies that show a minor increase in ambient temperatures would affect wildlife."

Additionally, on August 16, 2021, JVR's counsel submitted a letter to the Board, with additional responses on issues including the heat island effect. The letter attached a 2018 report from one of the authors of the 2016 article cited by the State Parks, which found the "spatial extent of the effect

56

is constrained" and "[b]olstering . . . vegetation . . . will mitigate the [heat island] effect."

Thus, Appellant do not establish any failure to address the heat island effect or its impacts. (See *Plant Society, supra*, 172 Cal.App.4th at p. 626.)

Second, Appellants assert the FEIR "ignor[es] the specific impacts on vulnerable birds and the insects on which they feed," but rely on multiple record citations without elaboration. The FEIR did not ignore environmental impacts generally, as discussed above, and Appellants forfeit their point about "specific impacts" by not providing reasoned argument. (*Badie, supra*, 67 Cal.App.4th at pp. 784.) We would reject it regardless. Their citations include the State Parks DEIR comment and USFWS-provided 2016 article on the pseudo-lake effect, but neither specifically addressed heat island impacts on birds or insects. Although the CDFW letter (not cited by Appellants here) did raise a concern about heat harming birds, the FEIR addressed it, in part by referring to the heat island global response.

7.    *Wildlife Connectivity*

Finally, Appellants claim the FEIR "dismisses [the State Parks'] comment that the Project may interrupt wildlife migration between the [p]eninsular ranges of the adjacent Anza-Borrego Desert State Park Wilderness to the north and the mountains in Mexico to the south," and that "[l]oss of this connectivity" has various negative impacts. Their FEIR discussion in their opening brief is cursory at best, and their argument is unpersuasive regardless.

We start with the FEIR, which did analyze wildlife connectivity impacts, including in response to the State Parks. The pertinent State Parks' DEIR comments were brief. They stated "[d]evelopment such as this project in the San Diego border region fragments habitat and threatens wildlife

57

corridors," and that "environmental review of this project must include the wildlife connectivity through the Peninsular Ranges between Mexico and the United States."

The FEIR's biological resources technical report stated the Project will "ensure the preservation of a north/south movement corridor for wildlife traversing under the I-8 (M-BI-3) and provides an east/west movement corridor along the SDG&E easement with a dedicated access point north of the easement (M-BI-3)." The report and the FEIR elaborated on how the movement corridors would work (e.g., north-south along a floodplain), and how the biological easement fence was designed to permit wildlife entry in and out. The FEIR further stated the Project was "designed to maintain movement corridors" and the area would remain "predominantly rural with significant undeveloped areas and wildlife movement opportunity."

Responding to the State Parks, the FEIR acknowledged their comment that the Project's environment review "must include the wildlife connectivity through the Peninsular Ranges"; stated this did not raise an issue as to DEIR adequacy or require a response; and, regardless of the accuracy of that statement (which Appellants dispute), still provided a response. In addition to summarizing the wildlife movement information referenced above, it noted the easement fence opening "would allow wildlife . . . to find a break in the fencing leading them into the larger wildlife corridor in the Peninsular Ranges between Mexico and the United States."

The FEIR concluded there were potentially significant wildlife connectivity impacts, but with mitigation, they would be less than significant. Accordingly, Appellants do not establish the FEIR failed to adequately analyze wildlife connectivity impacts. (*Plant Society, supra*, 172 Cal.App.4th at p. 626.) Their specific points here also lack merit.

58

First, Appellants contend the FEIR's response to the State Parks falsely repeated a claim from the DEIR that " 'wildlife is not constrained to travel through the area.' "  They do not establish any inaccuracy.  Both the DEIR and FEIR response stated that "[g]iven the undeveloped land to the north and east, the Project site does not currently serve as a local or regional wildlife corridor since wildlife is not constrained to travel through the area."  Viewed in context, they were discussing conditions *before* the Project, not after.

Second, Appellants dispute wildlife can "go elsewhere," asserting "[e]ach net loss matters."  But as the FEIR explained, the Project maintains existing corridors (with modifications to the biological easement fence to facilitate passage).  Further, we already rejected their net loss argument in the tricolored blackbird context, explaining CEQA does not require mitigation to "completely eliminate" impacts.  (*Save the Hill, supra*, 76 Cal.App.5th at p. 1117.)

Third, they cite the State Parks letter to argue that "[l]oss of this connectivity prevents seasonal migration and impairs genetic diversity, harming and potentially extirpating mammals such as the Peninsular bighorn sheep whose survival depends on this migratory corridor."

However, the State Parks letter does not say the stated concerns exist at the Project site, including for the Peninsular bighorn sheep.  It mentions sheep twice:  to note a prior land acquisition was meant to buffer a water source for them, and to state wildlife corridors through the Project footprint "could be mitigation measures that benefit species . . . like the big horn sheep"—suggesting it considered mitigation a feasible means to address impacts that did occur.  Meanwhile, the biological resources technical report stated the Peninsular bighorn sheep "has not been identified in the area

59

previously." And, even if such concerns did exist, the FEIR concluded wildlife connectivity impacts would be mitigated below significance.

D.    *Cultural Resources*

Appellants contend the FEIR did not complete government-to-government consultation with the Manzanita Band of the Kumeyaay Nation (Manzanita Band or Tribe) or "respond in good faith" to their concerns, and, due partly to these alleged failures, the Project's analysis of cultural resources was deficient. They do not establish any lack of required consultation or analysis.

1.    *Additional Law and Facts*

Pursuant to the Assembly Bill No. 52 (Assembly Bill 52) process, CEQA requires that a lead agency consult with a Native American tribe affiliated with a project area before certifying the EIR, if the tribe requests consultation within 30 days of notification of the project. (*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 305, fn. 17; § 21080.3.1, subd. (b).) A separate Government Code process (Senate Bill 18) "requires a city or county prior to amending a general plan to consult with affected . . . tribes," if they request consultation within 90 days. (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 221; Gov. Code, § 65352.3, subd. (a)(1), (2).)

According to the FEIR, a certified letter initiating government-to-government consultation was mailed on February 5, 2019, and the Tribe requested consultation on May 3, 2019 (thus meeting only the Senate Bill 18 deadline). The County sent e-mails to the Tribe's historical preservation officer, Lisa Haws, and its chairperson, Angela Elliott-Santos, "request[ing] meeting dates . . . on January 7, 2020, February 25, 2020, and on April 27,

2020." The FEIR stated "[n]o responses were received by the County, and consultation was concluded on May 27, 2020 due to a lack of response."[16]

On November 16, 2020, a Manzanita councilman, Johnny EagleSpirit Elliott, sent an e-mail stating they were preparing comments and requesting information. On December 7, 2020, Haws submitted a DEIR comment letter on behalf of the Tribe. The letter raised various concerns, including about the description of historical population movement, cumulative impacts, and mitigation. It said the comments were "preliminary" and "additional comments will be provided during government-to-government consultation," explaining Haws e-mailed a County staff member on December 2, 2020, about Elliot's request, was told the staff was preparing a response, and was not given a target date. The letter did not address the communications in 2019 and early 2020.

The FEIR contained sections on cultural and tribal resources, as well as an appendix with a cultural resources report and responses to tribes that submitted comments. It found no "tribal cultural resources" (TCRs) or significant archaeological sites were identified, and the Project "would not contribute to a significant cumulative impact to cultural resources." It acknowledged there was the "potential for inadvertent discovery of TCRs," but found mitigation would reduce the impact to less than significant. Mitigation measures include M-TCR-2 (archaeological and tribal monitoring), which incorporated construction monitoring by the Project archaeologist and a Kumeyaay monitor who could halt operations.

---

16　The FEIR is unclear as to whether the meeting requests were sent on the identified dates, or the meetings were requested for those dates, but is clear no response was received by May 27, 2020, either way.

The FEIR provided a thorough response to the Manzanita Band. Regarding government-to-government consultation, it described the communication chronology and, as noted, stated consultation was concluded on May 27, 2020 "due to lack of response." It further indicated that because the Project no longer sought to amend the general plan, Senate Bill 18 did not apply. It then stated that "[a]lthough formal consultation is not required," the "County looks forward to working with Manzanita should consultation be required as a result of an inadvertent discovery." It repeated similar language elsewhere in the response. The response also addressed the Tribe's concerns. For example, it stated the FEIR was revised to elaborate on historical population movement and to include tribal consultation language in the mitigation measures. For cumulative impacts, it referred them to the FEIR analysis of potential impacts to tribal and cultural resources.

On August 17, 2021, the day before the Board hearing, Haws provided a further comment letter from the Manzanita Band. It stated the County statement about government-to-government consultation being concluded on May 27, 2020 due to a lack of response was "not valid," citing the tribe's November and December 2020 input, subsequent communications, and a general FEIR comment on tribal consultation under Assembly Bill 52. It did not address the context for the FEIR's explanation about consultation being concluded (i.e., the Tribe's failure to timely request Assembly Bill 52 consultation in 2019, or to respond to Senate Bill 18 meeting requests in early 2020). The letter also continued to raise substantive concerns, and asserted impacts to cultural and tribal resources were "minimized" and the EIR analysis was "segmented to further reduce and negate any impacts."

2.  *Analysis*

First, Appellants contend the County did not complete government-to-government consultation with the Manzanita Band.  They acknowledge the County claimed the Tribe missed a consultation deadline and failed to respond to meeting requests, but contend the Tribe made a "renewed request for consultation" and the County "refused to reopen" it.  Their position lacks merit.

Appellants do not appear to dispute the County's determination that consultation concluded under the tribal consultation statutes on May 27, 2020 (or that Senate Bill 18 no longer applies).  Rather, they suggest the County should have reopened consultation at the Tribe's request.  But they cite no authority mandating consideration of a renewed consultation request, and for the Tribe's part, it denied that consultation ever concluded—without explaining the missed deadline in 2019 and unanswered meeting requests in early 2020.  Appellants' belated justification for the unanswered requests in its reply brief here (that COVID-19 interfered) amounts to speculation, which is not evidence.  (Cf. *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.)  We conclude the County properly determined the formal consultation process ended in May 2020.  (See § 21080.3.2, subd. (b) ["consultation shall be considered concluded" when, inter alia, a "party, acting in good faith and after reasonable effort, concludes that mutual agreement cannot be reached"]; § 21082.3, subd. (d) [lead agency may certify EIR if tribe "failed to request consultation within 30 days"].)

Second, Appellants do not establish the FEIR failed to respond in good faith to the Manzanita Band, or otherwise provided an inadequate analysis of the cultural and tribal resources.  (*Plant Society, supra*, 172 Cal.App.4th at

63

p. 626.)  As described above, the FEIR analyzed those resources in detail, including by addressing the Tribe's DEIR comments.

Appellants' specific points here also lack merit.  After describing concerns from the Manzanita Band's August 17, 2021 letter, they cite the FEIR response to its *DEIR* comments to contend the FEIR "essentially dismissed" their concerns and yet stated the "County looks forward to working with Manzanita should consultation be required."  They also claim the FEIR omitted "cumulative cultural impacts."  This characterization of the FEIR is confusing and inaccurate.  The FEIR did respond to the concerns timely raised in the Tribe's DEIR comment letter, including cumulative impacts.  As for the "looks forward" comment in the FEIR response, Appellants omit the concluding language:  "should consultation be required as a result of inadvertent discovery."  Such discoveries were an identified concern in the FEIR, and mitigation measures incorporated tribal input.

Appellants also argue generally that CEQA "requires EIRs to specifically address impacts on 'tribal cultural resources,' which include 'sites, features, places, cultural landscapes, sacred places and objects with cultural value," but they do not provide reasoned argument on any specific deficiency (other than cumulative impacts, which, again, the FEIR addressed).  On reply, they maintain it was sufficient for them to quote from the Tribe's August 17, 2021 letter, and attempt to address factual points not raised in their opening brief.  We disagree, and deem the points forfeited.  (*Badie, supra*, 67 Cal.App.4th at pp. 784-785; cf. *Groundwater Cases, supra*, 154 Cal.App.4th at p. 690, fn. 18 [it is " 'inappropriate for . . . appellate brief

to incorporate by reference documents . . . from the proceedings below' "

(italics omitted)]; *Raceway, supra*, 2 Cal.5th at p. 178.)[17]

Finally, Appellants cite *Save Agoura, supra*, 46 Cal.App.5th 665, but the case is procedurally and factually distinguishable. There, the Court of Appeal affirmed the set-aside of a negative declaration for a mixed-use project that improperly deferred mitigation for a prehistoric archaeologic site, and held an EIR was required. (*Id.* at pp. 686-690.) Here, there was an EIR that analyzed cultural and tribal resources; no tribal cultural resources or significant archaeological sites were identified; and the EIR still implemented measures to mitigate impacts.

E.    *Agricultural Resources*

Appellants argue the Project's impacts on agricultural resources are "significant and yet inadequately studied and mitigated." The FEIR determined agricultural impacts were not significant under the County's Local Agricultural Resources Assessment (LARA) model, and no mitigation was required. Appellants do not establish this determination was inadequate.

The FEIR addressed the Project site's historical farming operations and available farmland, the LARA model, and how it applied here. Historically, part of the site was used for agriculture from 1954 through 2012 or 2014, with a 22-year fallow period from 1980 to 2002. The site has around "600 acres . . . available for agricultural use." This includes around "34% Department of Conservation Farmland Mapping and Monitoring Program (FMMP) Important Farmland" (including "35.3 acres of Farmland of Local

_____

[17]    We have a comment on one reply point. Appellants note the Tribe's concern about a "segmented" analysis, but cite no authority that addressing cultural and tribal resources separately is inadequate.

Importance, 275 acres of Prime Farmland, 143.4 acres of Farmland of Statewide Importance, and 4.3 acres of Unique Farmland"). Most of the site is " 'Other Land,' . . . defined as land that does not meet the criteria of any other FMMP category."

As for the County's LARA model, the FEIR explained it is meant to "captur[e] the unique and varied character of San Diego agriculture." It uses "three Required Factors (water, climate, and soil quality) and three Complementary Factors (surrounding land uses, land use consistency, and slope)," and each factor "receives a rating of high, moderate, or low importance" based on "site-specific" information. The final LARA result is based on a "combination of . . . ratings," in accordance with a table in the County's Guidelines for Determining Significance – Agricultural Resources (Agricultural Guidelines). According to the table, one "low" rating means a resource is not an important agricultural resource.

The FEIR stated the Project is rated moderate on water, climate, and soil quality, high on surrounding land uses and slope, and low on land use consistency. It explained the land use consistency rating is due to the median parcel size within the Project site exceeding the median parcel size in the applicable surrounding zone by 10 acres or more. Thus, it concluded, the "Project site does not have important agricultural resources, as defined by the LARA Model"; agricultural impacts "would be less than significant"; and no mitigation is necessary. It elsewhere noted the site could return to agriculture after decommissioning.

Appellants dispute the FEIR's application of the LARA model "land use consistency factor," and contend multiple record portions "refute" land use inconsistency. These arguments lack merit.

With respect to the LARA model, Appellants argue the FEIR "acknowledges the site scores well on five of six factors," but claims it is not an important agricultural resource on the "sole grounds it scores 'Low' on the sixth factor, 'land use consistency' " because "nearby Jacumba's poor residents own small lots." This argument disregards the FEIR's explanation that a single low rating causes a "not significant" LARA result, as well as its description of how the low rating was determined here (i.e., 10-plus acre parcel size difference).

Appellants' arguments that the record supports land use consistency disregard the LARA model and are not persuasive regardless.

First, they argue Jacumba's "tiny lots pose no threat to this farmland; they have peacefully coexisted for nearly a century next to this farm without encroaching upon it." The FEIR did acknowledge the historical farming operations, but land use consistency under LARA turns on parcel size, not coexistence. Further, the County's Agricultural Guidelines elaborate on the reasoning for using this factor; namely, urbanization impedes commercial agriculture.

Second, Appellants argue "large parcels predominate for miles in all other directions, yielding a '[h]igh' score on 'surrounding land uses.' " Surrounding land use is a distinct LARA model factor, and does not limit the effect of the low rating for land use consistency.

Third, they contend the Subregional Plan and Vision Statement "designate farmland a consistent land use, and indeed, seek to 'reinforce the rural small town character of the area, which includes agriculture . . . as [an] important element[ ] of the community.' " They also argue the FEIR "ignores the Project's own 'land use inconsistency,' admitting elsewhere the site must eventually 'return' to a use consistent with the General Plan" (citing the

67

FEIR statement that the land must "return to a use that is consistent with the [Zoning Ordinance] at the time of dismantling"].) These arguments appear to conflate the issue of consistency with planning documents (*Clews, supra*, 19 Cal.App.5th at p. 201), with the issue of land use consistency based on parcel size under the LARA model. Further, we already concluded the Project was consistent with the Subregional Plan and Vision Statement, and rejected Appellants' argument that the FEIR language regarding dismantling reflected an implicit admission of zoning inconsistency.

Fourth, Appellants assert the low land use consistency rating "trivializes the California Department of Conservation's recognition of this farmland as significant." They cite no authority that the County must consider the farmland categories, nor elaborate on what the categories mean or how they relate to the LARA model, and their citation to a comment letter without explanation does not suffice. (See *Badie, supra*, 67 Cal.App.4th at pp. 784-785; *Groundwater Cases, supra*, 154 Cal.App.4th at p. 690, fn. 18.) We note the FEIR and County's Agricultural Guidelines do address these matters. Both explained the farmland "categories are based on local soil characteristics and irrigation status," and the Guidelines further indicated that soil types factor into the LARA soil quality rating—not land use consistency.

Finally, Appellants' argument that the FEIR fails to mitigate agricultural impacts rests on their assumption that the impacts are significant. Because they have not shown that, they establish no failure to mitigate, either, and we need not address their authorities in this regard. (See *North Coast, supra*, 216 Cal.App.4th at pp. 649–650 [where energy impacts would be insignificant, the EIR did not need to discuss particular alternative mitigation measure].)

F.     *Additional Issues in Appellants' Statement of Facts*

Appellants' Statement of Facts contains a section titled "The Project Would Have Severe Environmental Impacts." Although certain points relate to impacts they raise in their argument section, they allege additional impacts too: (i) wildfire risk, including due to lithium ion batteries; (ii) other battery risks; (iii) impacts to Jacumba Airport; (iv) groundwater; (iv) flooding; (v) electrocution; (vi) emissions; and (vii) aesthetic resources.

Respondents contend Appellants forfeited these points by not raising them in their argument section. On reply, Appellants characterize them as "historic, background and contextual facts," and state "[a]ll of the arguments raised in this appeal are set forth in the 'Argument' section." We conclude Appellants have forfeited any arguments based on the above issues. (See Rule 8.204(a)(1)(B); *Badie, supra*, 67 Cal.App.4th at pp. 784-785.) We note Appellants mention certain of these issues in their General Plan Policy 18.3 argument (i.e., fire and other battery risks, airport impacts), and elect to explain why their contentions regarding these issues lack merit.

First, Appellants argue the Project "creates severe wildfire hazards in an extreme high-fire hazard zone," citing prior wildfires in the area. They also argue the Project "would impede wildfire suppression," because fire fighters will have "to wait for fire[s] to burn out . . . ." Appellants do not establish the FEIR failed to adequately consider or mitigate wildfire risk.

The FEIR determined wildfire risk would be potentially significant, but would be mitigated below significance with mitigation measures including an attached Fire Protection Plan. Appellants criticize the plan for, among other things, relying on "dated (2006)," "generic," and ineffective California Public Utilities Commission protocols. This appeal is not a proper vehicle to criticize prior enactments by other agencies. The FEIR also explained why

69

fires would be allowed to burn out: the Project's batteries would be "located . . . to avoid contact with other flammable sources," so the "most efficient way to control any fire would be to let it burn in place." The FEIR found elsewhere that the Project would not significantly impact emergency response plans.[18]

Second, Appellants argue the Project uses "needlessly fire-prone and toxic lithium ion batteries," citing risks like toxic fumes and "thermal runaway," even though a "less hazardous type of battery was already in use in nearby Campo" (i.e., iron flow batteries). They rely in part on public comments, including one that cites an article about a battery fire at a Tesla factory in Australia. This showing does not establish the FEIR discussion of battery safety was inadequate, or call into question the developer's decision to use lithium ion batteries.

The FEIR described how the Project's battery storage system was "designed to minimize the risks of starting a fire." It noted, in part, they would be using "[l]ithium-ion nanophosphate batteries" that had proven "less vulnerable to fire . . . than typical [l]ithium-ion batteries" and whose "chemistry . . . substantially reduces the possibility of thermal runaway" (i.e., batteries heating faster than they can cool). Lay concerns about lithium ion batteries do not undermine these findings. (See *Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 791 ["lay opinion

_____

[18] Appellants make an opposed request for judicial notice of a journal article regarding wildfire impacts on greenhouse gas reductions. We decline to take notice, as the article is not relevant to disposition of this appeal. (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 59, fn. 7 [denying judicial notice of irrelevant material].)

70

based on technical information that requires expertise does not constitute substantial evidence"].)

As for the battery selection, the August 2021 BayWa memorandum noted a commenter asked about iron flow batteries at Campo, and stated "lithium-ion batteries are the leading technology for utility-scale battery energy storage systems"; they are "already safely operating" elsewhere in the County; and iron-flow batteries are "still a nascent technology . . . ." Developer JVR could reasonably conclude lithium ion batteries were a safe and preferable option.

Third, Appellants argue the FEIR "fails to disclose that placing collision hazards around the end of [the Jacumba Airport] runway" is dangerous because its main use is by glider planes with unstable flight paths (while also stating the FEIR "claims planes in distress could land in the narrow strips between the solar arrays"). They cite comments from the glider airport director, Alasdar Mullarney, who expressed concerns about limited space for emergency landings, the need to jettison cables in emergency situations, and other issues.

The FEIR did acknowledge the airport was "mainly used as a glider facility," addressed potential hazards, and found the Project was consistent with the Jacumba Airport Land Use Compatibility Plan (ALUCP). It explained the ALUCP addressed emergency landings for light aircraft via open land requirements, and the Project site had nearly 24 acres available (four times the amount required under the applicable criteria). The FEIR also contained a global response on airport impacts, which noted Mr. Mullarney's input. Appellants establish no lack of disclosure or analysis here, either.

DISPOSITION

The judgment is affirmed. Respondents will recover their costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

KELETY, J.